Timothy L. HOWARD *v.* STATE of Arkansas

CR 05-699 238 S.W.3d 24

Supreme Court of Arkansas
Opinion delivered June 29, 2006

*Montgomery, Adams & Wyatt, PLC*, by: *Dale E. Adams*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Timothy Howard was convicted of two counts of capital murder for the deaths of Brian and Shannon Day, and one count of attempted capital murder for the attempted killing of the Days' infant son, Trevor. For these convictions, Howard received two death sentences and a sentence of thirty years in prison. In a 4–3 opinion, this court affirmed his convictions and sentences. *See Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002). Following this court's decision, Howard filed a petition for postconviction relief pursuant to Ark. R. Crim. P. 37.5 on March 21, 2003. Howard subsequently filed an amended Rule 37.5 petition on April 12, 2004, raising eight grounds for relief.[1] The Little River Circuit Court held a hearing on Howard's petition on December 20, 2004, and issued its order on March 17, 2005, denying each of Howard's claims for relief. Howard filed a timely notice of appeal, and now raises seven arguments for reversal.

In appeals of postconviction proceedings, we will not reverse a trial court's decision granting or denying postconviction

---

[1] The amended petition was not verified by appellant, as required by Ark. R. Crim. P. 37.1(c); because this is a death-penalty case, on May 25, 2006, this court issued a *per curiam* opinion giving Howard fifteen days to file a properly verified petition. *See Howard v. State*, 366 Ark. 453, 236 S.W.3d 508 (2006) (*per curiam*). Howard filed his supplemental record on June 8, 2006.

relief unless it is clearly erroneous. *Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151(2004); *Dansby v. State*, 350 Ark. 60, 84 S.W.3d 857 (2002). A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Johnson, supra; Davis v. State*, 345 Ark. 161, 44 S.W.3d 726 (2001).

Howard's first argument on appeal contends that he was denied his due process rights when the State introduced the testimony of trial witnesses Penny Granger and Darby Neaves, who both testified that Shannon Day was pregnant when she was killed, because the State knew that Shannon was not pregnant at the time of her murder.[2] Howard argues that the State knowingly introduced false testimony in order to bolster its theory of the case, which was that Howard killed the Days because of his intimate relationship with Shannon.[3] This alleged prosecutorial misconduct, Howard argues on appeal, violated his rights to due process.

Generally, Rule 37 does not provide a remedy when an issue could have been raised in the trial or argued on appeal. *See Camargo v. State*, 346 Ark. 118, 55 S.W.3d 255 (2001). Stated another way, it is not appropriate to raise trial errors, including constitutional errors, for the first time in a Rule 37 proceeding. *See Rowbottom v. State*, 341 Ark. 33, 13 S.W.3d 904 (2000); *Finley v. State*, 295 Ark. 357, 748 S.W.2d 643 (1988). However, there is an exception to this general rule for errors that are so fundamental as to render the judgment of conviction void and subject to collateral attack. *Rowbottom*, 341 Ark. at 37, 13 S.W.3d at 906 (double-jeopardy claim was a fundamental claim that appellant could raise for the first time in Rule 37 proceedings); *see also Collins v. State*, 324 Ark. 322, 920 S.W.2d 846 (1996) (right to twelve-member jury is such a fundamental right that it could be raised for the first time in a Rule 37 proceeding); *Jeffers v. State*, 301 Ark. 590, 786 S.W.2d 114 (1990) ("[a] ground sufficient to void a conviction must be one so

---

[2] The medical examiner stated at the Rule 37 hearing that, although it did not appear that Shannon was pregnant at the time of her death, unless she was in the very early stages of pregnancy, he could not absolutely prove that she was not.

[3] At trial, the State argued that the testimony regarding Shannon Day's alleged pregnancy was relevant to prove a sexual relationship between Howard and Shannon and to demonstrate that there was a conflict between Howard and Brian Day — a contention that could have provided a motive for the murders.

basic that it renders the judgment a complete nullity, [as,] for example, a judgment obtained in a court lacking jurisdiction to try the accused . . .").

■ Howard argues that his constitutional right to due process was violated by alleged prosecutorial misconduct in the form of knowingly presenting false testimony; thus, the first question to be addressed is whether "prosecutorial misconduct" is a ground "so basic that it renders the judgment a complete nullity," *see Jeffers, supra,* or whether it is an issue that should have been raised at trial or on direct appeal. This court has held that a claim of prosecutorial misconduct was "an issue that could have been raised at trial." *See Burnett v. State,* 293 Ark. 300, 737 S.W.2d 631 (1987) (*per curiam*) (declining to consider an argument, raised for the first time in a Rule 37 proceeding, that the State had engaged in prosecutorial misconduct by failing to disclose a witness's statement until only a few days before trial). Further, in *Rowbottom, supra,* this court declined to reach appellant Rowbottom's Rule 37 argument regarding alleged discovery violations by the prosecution in not disclosing its intention to introduce certain evidence, because Rowbottom had not raised the issue either at trial or on direct appeal. *Rowbottom,* 341 Ark. at 40-41, 13 S.W.3d at 908-09. Therefore, we conclude that the issue of alleged prosecutorial misconduct is an issue that should have been raised on direct appeal, and is not a claim that may be raised for the first time in a Rule 37 petition.

In his second point on appeal, Howard argues that, under *Ring v. Arizona,* 536 U.S. 584 (2002), the information charging him with capital murder was defective because it failed to enumerate any of the four aggravating circumstances upon which the State relied to obtain the death penalty.[4] The two counts of information

---

[4] *Ring, supra,* does not hold that aggravating factors must be set forth in the charging document. Rather, *Ring* declared unconstitutional the Arizona capital sentencing scheme, which permitted a trial court, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi* [*v. New Jersey*], 530 U.S. [466] at 494 n.19, the Sixth Amendment requires that they be found by a jury." *Ring,* 536 U.S. at 609. The Eighth Circuit has held that, in federal prosecutions, any fact, other than prior convictions, that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *See*

charging Howard with capital murder, filed in Little River County Circuit Court on December 19, 1997, stated only that Howard was charged with committing capital murder "with the premeditated and deliberated purpose of causing the death of another person[.]" The information did not enumerate the statutory aggravating factors that the State subsequently submitted to the jury.[5]

■ As with Howard's first argument, this is a claim that should have been presented on direct appeal. As the State points out, even though *Ring* was decided mere days before this court denied Howard's petition for rehearing, the direct-review process encompasses certiorari proceedings. *See Caspari v. Bohlen*, 510 U.S. 383 (1994). Thus, Howard could have presented his *Ring-* and *Allen*-based argument in his petition for writ of certiorari to the United States Supreme Court, but he did not. Accordingly, he is barred from raising it for the first time during the course of his postconviction proceedings. *See Williams v. State*, 346 Ark. 54, 56 S.W.3d 360 (2001) (even constitutional issues must be raised on direct appeal, rather than in Rule 37 proceedings).

. Howard's third point on appeal is that one juror, Larry Crutchfield, gave inaccurate responses during voir dire. In response to questions regarding his feelings about the death penalty, Crutchfield replied to the effect that he "d[id]n't know about the death penalty," "could not consider the death penalty," and "could not go through with the death penalty" because he felt it was "too harsh and bad for society." Juror Crutchfield also stated that he "would vote against capital punishment automatically" and "would vote against it without any consideration of facts or circumstances." However, in an affidavit submitted in support of Howard's Rule 37 petition, Crutchfield averred that he had "always believed that if you intentionally take a life then you

---

*United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005). However, the *Allen* court did not extend this holding to state prosecutions. *Id.* at 942 (noting that the Fifth Amendment's grand-jury requirement has not been construed to apply to the states).

[5] Those four aggravating factors were as follows: 1) in the commission of the capital murder, Tim Howard knowingly created a great risk of death to a person other than the victim; 2) in the commission of the capital murder, Tim Howard knowingly caused the death of Brian Day and Shannon Day in the same criminal episode; 3) the capital murder was committed for pecuniary gain; and 4) the capital murder was committed in an especially cruel or depraved manner. The jury unanimously determined that the State proved each of these aggravating circumstances beyond a reasonable doubt.

should forfeit your life in return," and that his responses during voir dire "do not now, nor did they at the time, reflect [his] philosophy about imposing the death penalty." This inconsistency in Crutchfield's responses, Howard argues, caused Howard to be denied a fair and impartial jury.

This court has held that Rule 37 does not provide a means to challenge the constitutionality of a judgment where the issue could have been raised in the trial court, and a defendant's remedy for alleged juror misconduct is to directly attack a verdict by requesting a new trial pursuant to Ark. Code Ann. § 16-89-130(c)(7) (Repl. 2005). *See Cigainero v. State*, 321 Ark. 533, 906 S.W.2d 282 (1995) (rejecting argument that claims of juror misconduct could be raised for the first time in a Rule 37 proceeding). Accordingly, Howard's claims pertaining to juror Crutchfield's alleged untruthfulness are not cognizable in this postconviction proceeding.

For his fourth point on appeal, Howard argues that the "dual role" of Little River County Sheriff Danny Russell as both bailiff and State's witness was a denial of his due process rights. Sheriff Russell was called as the State's first witness at trial and testified that he was the officer who discovered Brian Day's body inside a padlocked U-Haul trailer; he also discovered Shannon Day's body in a closet in the Days' home. However, Sheriff Russell also served as the bailiff in the circuit court in which the trial was conducted. At the Rule 37 hearing, he testified that, as bailiff, he would escort the jurors between the courtroom and the jury room, and would occasionally serve coffee to all the jurors. He also stated that, even though he was a witness, he was allowed to remain in the courtroom as part of an agreement between the State and defense counsel, whereby the investigators on Howard's defense team were allowed to stay in the courtroom during trial as well.

Thad Bishop, one of Howard's trial attorneys, testified at the Rule 37 hearing that he and the other defense lawyers entered into an agreement with the State to allow both the sheriff and the defense investigators in the courtroom, even though "the Rule" had been invoked. Both Sheriff Russell and Bishop testified that they were unaware of any improper contact with the jury members.

On appeal, Howard cites *Turner v. Louisiana*, 379 U.S. 466 (1965), in support of his argument that this situation was

presumptively prejudicial. However, we cannot reach the merits of Howard's argument, as he waived any error that may have arisen from the sheriff's acting as witness and bailiff. First, this was an argument that could and should have been made on direct appeal. Second, as both the sheriff and attorney Bishop testified, the State and the defense agreed for the sheriff to remain in the courtroom in exchange for the defense team to be able to keep its investigators in the room as well. In *Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001), this court held that the Rule 37 petitioner, Lee, had waived any argument concerning his Sixth Amendment right to conflict-free counsel when he agreed on the record that he was satisfied with his attorney's services, despite allegations of a conflict of interest. *Lee*, 343 Ark. at 711-12, 38 S.W.3d at 340-41. Because Lee had waived the alleged conflict of interest prior to trial and did not raise the issue again on direct appeal, waiting instead until his Rule 37 petition, this court refused to consider his argument. *Id.* at 714, 38 S.W.3d at 342. Similarly, in the instant case, Howard and the State stipulated prior to trial that the sheriff could remain in the courtroom, even though he was both a witness and the bailiff. Because Howard waived the issue prior to trial and did not raise the argument on appeal, we hold that the argument is waived.

Howard's fifth point on appeal concerns an issue that arose on the second day of trial. That morning, the trial court informed the parties that a juror, Barbara Williams, had approached the judge the day before to tell him that, during one of the breaks, she had overheard a police officer saying, "This jury is going to hang [Howard]." When the court confronted the officer with the accusation, the officer denied making the statement. The court inquired of Williams whether the remark had affected her ability to remain fair and impartial, and she indicated that it would have no effect on her and that she could still be a good juror. Howard's attorney, Mac Carder, stated that the defense was comfortable with proceeding with Williams as a juror.

In his Rule 37 petition and on appeal, Howard argues that, when the trial court questioned the unnamed police officer and juror Williams alone and off the record, the court received extra-judicial evidence in violation of Howard's Sixth Amendment right to be present when evidence is received. He asserts that, had the court wanted to inquire of the juror as to what happened, the court should have followed the procedure set out in Ark. Code

Ann. § 16-89-125(e) (Repl. 2006),[6] and that violation of this procedure "is regarded as so fundamental that it is an exception to the contemporaneous objection rule," and that the error cannot be presumed harmless.

■ The State contends that Howard has raised an argument on appeal that was not made to the trial court. In his Rule 37 petition, Howard asserted that the off-the-record hearing between the court and Williams violated his right to confront and cross-examine witnesses against him — a different contention than the one he raises on appeal; further, Howard argues on appeal that the trial court should have followed the statutory procedures set out in section 16-89-125(e), an argument that was not raised before the trial court. However, Howard's petition did assert that the discussion between the court and Williams violated his due process right to be present for all proceedings. This "critical stage" argument was thus raised before the trial court. However, the trial court did not address this argument in its order denying postconviction relief. Therefore, because Howard failed to obtain a ruling on this argument, we decline to address it. See Fisher v. State, 364 Ark. 216, 217 S.W.3d 117 (2005) (noting that it is appellant's obligation to obtain a ruling in order to preserve an issue for appellate review); Huddleston v. State, 347 Ark. 226, 61 S.W.3d 163 (2001) (failure to obtain a ruling on an issue at the trial court level, including a constitutional issue, precludes review on appeal); Beshears v. State, 340 Ark. 70, 8 S.W.3d 32 (2000).

In his sixth point on appeal, Howard raises six separate claims of ineffective assistance of counsel; several of these claims have numerous subpoints. In an appeal from a trial court's denial of a Rule 37 petition, the question presented to us is whether, based on the totality of the evidence, the trial court clearly erred in holding that counsel's performance was not ineffective under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Jackson v. State, 352 Ark. 359, 105 S.W.3d 352 (2003). Under the standard set forth in Strickland, supra, to determine ineffective assistance of counsel, the petitioner must show first that counsel's

---

[6] That statute provides that, "[a]fter the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties."

performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Cook v. State*, 361 Ark. 91, 204 S.W.3d 532 (2005).

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *See Cothren v. State*, 344 Ark. 697, 42 S.W.3d 543 (2001). The language, "the outcome of the trial," refers not only to the finding of guilt or innocence, but to possible prejudice in the sentencing. *Lasiter v. State*, 290 Ark. 96, 717 S.W.2d 198 (1986). In making a determination of ineffective assistance of counsel, the totality of the evidence must be considered. *Id.* Furthermore, trial strategy is not a basis for postconviction relief. *Wooten v. State*, 352 Ark. 241, 91 S.W.3d 63 (2002).

In his first ineffective-assistance argument, Howard contends that the performances of his trial attorneys — Mac Carder, Latrece Gray, and Thad Bishop — were deficient because counsel did not adequately investigate and prepare for trial. At the Rule 37 hearing, attorney Carder testified that, at the time he tried Howard's case, he had only tried three other death-penalty cases, and he had seven other active death-penalty cases pending throughout the state. He claimed that Howard's case was "the most complex case [he had] ever been associated with," due to the existence of two crime scenes and multiple witnesses, and he felt hampered by the fact that the Public Defender Commission, for which he worked, suffered from budgetary restraints that curtailed his ability to travel and investigate Howard's case. On cross-examination, however, Carder agreed that he was certified by the Public Defender Commission to try death-penalty cases. Further, he noted that he spoke to over fifty witnesses and spent "hundreds of hours" doing so. In addition, he made "numerous trips" to

Ashdown to conduct investigation, and probably spent a total of between 400 and 500 hours investigating the case.

■ Howard points to Carder's admission that he had failed to adequately and properly prepare for trial, and that the errors he made were not matters of strategy, but were errors due to lack of investigation and preparation. However, we agree with the trial court's rejection of this testimony, wherein the court found that, "[u]nder the *Strickland* standard, [counsel's] performance is objectively evaluated according to professional standards of reasonableness, not by his own subjective assessment of his performance."

In addition, Howard lists thirteen areas of investigation that he believes counsel should have pursued. More particularly, Howard argues that the defense's pursuit of its theory of the case — that someone other than Howard committed the murders — prevented his attorneys from properly "trying to disprove the State's case[.]" He further notes that this court's majority opinion affirming his convictions found the most incriminating evidence against him to be his "inappropriate and unexplained behavior both before and after the discovery" of the Days. If counsel had "explained" the suspicious activities, he argues, he would not have been convicted, or at least would not have been affirmed on direct appeal.

■ Initially, we note that Howard did not enumerate the thirteen areas of investigation in his Rule 37 petition; rather, he relied on Carder's admissions that he did not have sufficient time to investigate and follow up on leads, that he was not prepared for trial, and that he believed he was ineffective. Accordingly, because he has raised new arguments in his appeal that were not presented to the trial court, we will not consider his new assignments of error pertaining to these specific areas he believed counsel should have investigated. *See Fisher v. State, supra.*

■ Further, however, Howard's argument essentially amounts to a challenge to his attorneys' determination of how they could best try the case.[7] For example, he argues, "Had defense counsel provided actual evidence rather than mere speculation of other people's involvement with the Days on the night of the

---

[7] At trial, Howard's theory of the case was that he had not committed the murders, and that he had been "framed" by unknown third parties. Had his attorneys conducted the additional hair, fiber, and fingerprint testing that Howard now argues should have been done,

murders, . . . the case would have turned out differently." However, counsel's decisions regarding what theory of the case to pursue represent the epitome of trial strategy — an issue that does not constitute a basis for a finding of ineffective assistance of counsel. *See, e.g., Noel v. State*, 342 Ark. 35, 26 S.W.3d 123 (2000); *Fretwell v. State*, 292 Ark. 96, 728 S.W.2d 180 (1987) (even though another attorney may have chosen a different course, trial strategy, even if it proves unsuccessful, is a matter of professional judgment).

In his second ineffective-assistance argument, Howard contends that his attorneys should have challenged the State's expert testimony regarding mitochondrial DNA, hair analysis, fingerprints, and pathology evidence. He notes that, in support of his Rule 37 petition, he submitted the affidavits of Susan Herrero and Dr. Randall T. Libby, who opined that counsels' failure to challenge this evidence, either through cross-examination or the use of independent experts, constituted ineffective assistance of counsel. Herrero's affidavit contended that, had counsel conducted the proper investigation, they would have discovered that the laboratory that conducted the DNA analysis was not accredited. Libby averred that the failure to examine the DNA data thoroughly, and well in advance of trial, would not allow counsel time to competently prepare for trial.

However, Howard fails to describe how a more searching pretrial investigation or a more thorough cross-examination of the State's expert would have changed the result of his trial. Instead, he simply states that counsels' failure to challenge the State's physical evidence constituted ineffective assistance. Such conclusory statements, wholly lacking in allegations of prejudice, fall far short of meeting the *Strickland* standard, and are insufficient to warrant Rule 37 relief. *See Dansby v. State*, 350 Ark. 60, 84 S.W.3d 857 (2002).

Howard's next subpoint is that his attorneys should have either asked for a hearing or moved for a mistrial once they learned about juror Williams's discussion with the court regarding the officer whom she overheard saying that the jury would "hang" Howard. He asserts that this failure fell below the objective standard required by counsel in death cases, and contends that

the testing might have revealed results that were unfavorable to the defense's strategy. Accordingly, his attorneys' decision not to pursue these additional lines of investigation was a matter of trial strategy.

counsel had an obligation to make sure that all evidence, testimony, and hearings be made a part of the record for purposes of appeal. Finally, he claims that his attorneys' failure to do so violated his right to be present at all critical stages of his trial, an error, he urges, that is presumed prejudicial.

There is no merit to Howard's argument. He contends that the taking of "extra-judicial evidence" outside of his presence violated his constitutional rights to be present at all critical stages of the trial, *see Kentucky v. Stiner*, 482 U.S. 730 (1987), and that prejudice is presumed from such error. *See Roe v. Flores-Ortega*, 499 U.S. 279 (2000). However, the Supreme Court has held that a "conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores [the] day-to-day realities of courtroom life and undermines society's interest in the administration of justice." *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (*per curiam*). The Court stated that, when an *ex parte* communication relates to some aspect of the trial, the court should disclose that communication to counsel for all parties, and the prejudicial effect of the court's *failure* to do so can be determined at a posttrial hearing. *Id.* at 119 (emphasis added). Further, the federal constitutional question of whether the alleged constitutional error was harmless depends to a great degree on the trial court's factual findings regarding the substance of the *ex parte* communications and their effect on the juror. *Id.* at 120. If the lower court makes a factual determination that the jury's deliberations, on the whole, were not biased, then that decision is accorded all due deference. *Id.*

In *Rushen*, the Court determined that the communication between the juror and judge was innocuous, and the juror and judge did not discuss any fact in controversy or any law applicable to the case. *Id.* at 121. On these facts, the Court held, the state courts correctly found that the jury's deliberations were not biased by the undisclosed communication of the juror's concerns to the court. Thus, any alleged constitutional error was harmless beyond a reasonable doubt. *Id.*

 Here, as noted above, the juror communicated to the court that she had heard a comment from an officer that the jury was going to "hang" Howard. The trial court notified counsel of this communication, and the juror informed the court that she could remain unbiased and had not been prejudiced by the officer's comment. Counsel was obviously satisfied with the juror's response, because the offer of a hearing on the issue was declined.

Accordingly, this court cannot presume prejudice from the fact of an unrecorded *ex parte* communication between the juror and the judge.

In addition, attorney Bishop testified at the Rule 37 hearing that the defense team did not want to lose Williams as a juror, stating that he "thought [she] was an excellent juror," and that he had coached her son on a mock-trial team. He further stated that he and the other attorneys talked about whether or not to keep her, and they decided together that if they made "a big issue" out of the situation, it might cause the State to excuse her, which would leave them having to call an alternate juror. Finally, Bishop testified that he and the other attorneys felt comfortable with the questions the judge asked Williams about whether she could be fair and impartial, and none of them had any complaints about how the court handled the inquiry. He said that their "thinking at that time was that we needed to get past this quickly before the prosecutor changes his mind and tries to strike her."

Clearly, this was a matter of carefully considered trial strategy. It is clear that, in Arkansas, matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Greene v. State*, 356 Ark. 59, 146 S.W.3d 871 (2004); *Simpson v. State*, 355 Ark. 294, 138 S.W.3d 671 (2003).

Howard's fourth contention regarding his attorneys' alleged ineffective assistance arises from their conduct during jury selection. He notes that his counsel used only seven of their twelve peremptory strikes, and argues that, as a result, several jurors were seated who had biases that warranted the exercise of peremptory strikes.

This court will not label counsel ineffective merely because of possible bad tactics or strategy in selecting a jury. *See Echols v. State*, 354 Ark. 530, 127 S.W.3d 486 (2003); *Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995). Jurors are presumed unbiased and qualified to serve. *Echols, supra*; *Isom v. State*, 284 Ark. 426, 682 S.W.2d 755 (1985) (*per curiam*). To prevail on an allegation of ineffective assistance of counsel with regard to jury selection, a petitioner first has the heavy burden of overcoming the presumption that jurors are unbiased. *Tackett v. State*, 284 Ark. 211, 680 S.W.2d 696 (1984) (*per curiam*). To accomplish this, a petitioner must demonstrate actual bias, and the actual bias must have been sufficient to prejudice the petitioner to the degree that he was

denied a fair trial. *Id.* Bare allegations of prejudice by counsel's conduct during voir dire that are unsupported by any showing of actual prejudice do not establish ineffective assistance of counsel. *Echols, supra; Hayes v. State*, 280 Ark. 509, 660 S.W.2d 648 (1983) (*per curiam*), cert. denied, 465 U.S. 1051 (1984).

Howard challenges his attorneys' decisions to seat four specific jurors: Janet Wright, Kenneth Gentry, Leander Lewis, and Ida Hooks. Regarding Janet Wright, Howard argues that she was the sister of Phillip Bush, one of the State's witnesses, and that she stated during voir dire that "she would require Howard to prove his innocence." However, during voir dire, Wright stated that she had never discussed the case with her brother, and that she had not formed an opinion about the case. Although she did say that she would "expect and require the defendant to prove his innocence," she clarified her answer when she was asked if she could follow the judge's instructions that the defendant did not have to prove his innocence, saying that she would "have to weigh the evidence that had been submitted." She further stated that she would not hold it against Howard if he did not testify.

At the Rule 37 hearing, Carder testified that he remembered telling the other lawyers that he was uncomfortable with Wright, but if he had been certain that she would have been a bad juror, she would not have sat on the jury. In addition, attorney Bishop stated that he and the other lawyers discussed Wright and decided they wanted her, partly because she was acquainted with the victims, and they thought she might have some knowledge of "what Brian Day was into," apparently a reference to his drug dealing. Based on this testimony, the decision to keep juror Wright was clearly a matter of trial strategy, and as noted above, this court will not label counsel ineffective because of "possible bad tactics" in jury selection. *Echols v. State*, 354 Ark. at 556, 127 S.W.3d at 502.

The next juror with whom Howard takes issue is Kenneth Gentry. On appeal, Howard argues that Gentry was an "automatic death penalty" juror, stating in his brief that Gentry testified that he would "not be willing to consider any evidence with regard to a person's history when deciding whether or not to impose the death penalty." However, Howard's claims in his brief appear to be at odds with Gentry's actual testimony during voir dire. The abstract of voir dire reflects that Gentry stated that he understood that the defense could present mitigating circumstances, and that

the jury would have to look at the aggravating circumstances and weigh them against the mitigating circumstances in order to make a decision on whether or not to assess the death penalty or life imprisonment. Further, he understood that there was a "presumption that life without parole is the more appropriate sentence," and said that it was "fair for the State to have to prove beyond a reasonable doubt that the death penalty is the more appropriate sentence."

At the Rule 37 hearing, Bishop testified that he and the other attorneys made the decision to keep Gentry on the jury because he had served on a Sevier County jury in an arson case that Bishop tried; that jury convicted the defendant, but only fined him. Again, the decision to keep Gentry was a matter of trial strategy. *See Camargo*, 346 Ark. at 125, 55 S.W.3d 260 (the decision to seat or exclude a particular juror may be a matter of trial strategy or technique). Further, Gentry's answers to voir dire do not indicate that he was biased against Howard. *See Echols*, 354 Ark. at 557, 127 S.W.3d at 503 (a petitioner must demonstrate actual bias; bare allegations of prejudice by counsel's conduct during voir dire that are unsupported by any showing of actual prejudice do not establish ineffective assistance of counsel).

Howard next challenges his attorneys' decision to seat juror Leander Lewis. Howard claims that Lewis was also an "automatic death penalty" juror, and that he expected the defendant to prove his innocence. Again, however, Howard takes an individual comment by the juror out of the larger context in which it was made. During voir dire, Lewis stated that his opinion of the death penalty was that, if the State proved the crime and the law called for it, the death penalty should be carried out. Even so, he said, he would consider life imprisonment as a punishment. In addition, Lewis testified that he believed in the constitutional provision that an accused is innocent until proven guilty, and although he "would think that the defendant would have to present evidence to prove his innocence," he stated that he would abide by an instruction from the judge that the defendant does not have to prove his innocence.

At the Rule 37 hearing, Carder testified that he wanted to keep Lewis on the jury because he was a member of the NAACP. Bishop also said that Lewis's NAACP membership was a factor, and he also noted Lewis's comment that ninety percent of the people he had spoken to believed Howard did not commit the

crime. Accordingly, the lawyers' decision to keep Lewis on the jury was a matter of trial tactics; moreover, as with juror Gentry, Lewis's answers during voir dire indicated that he was *not* an "automatic death penalty" juror, and Howard cannot demonstrate actual bias on that basis.

Finally, Howard challenges the selection of Ida Hooks. Hooks informed counsel during voir dire that she had a thyroid condition and a sleeping disorder, and that, because of her condition, she might go to sleep as she sat in the jury box. She said that she had a new medication that helped with the problem, but it was still "very easy" for her to fall asleep. After both the State and defense counsel expressed that Hooks was acceptable, the court noted its concern, saying it would be necessary to keep an eye on Hooks during the trial, and that if she dropped off a number of times, the court might have to use an alternate.

The selection of Hooks to serve on the jury was not unreasonable. She stated that her medication helped her condition, and Carder testified that the defense team wanted to keep her because she was from the Ogden area and was familiar with the scene. Attorney Gray stated that she and the others wanted African-Americans on the jury. Bishop stated that Hooks was married to a minister whom Bishop knew, and "everybody knew and liked them." Thus, the choice to select Hooks for the jury was a reasoned decision by the attorneys.

Howard argues further that it was ineffective assistance to keep Hooks on the jury once it became apparent that she had fallen asleep several times during the trial. After the State concluded its case, the judge asked counsel if they wanted to keep her, as she had fallen asleep at least three or four times. Counsel eventually decided against removing her from the jury, agreeing that they would "see how she [did during] the afternoon." Subsequently, after the defense rested, the court noted on the record that, for the last few hours, Hooks had not been sleepy, and that no one had had "to go over there and nudge her or anything." Carder stated that the defense had no concerns or objections to Hooks staying on the jury.

At the Rule 37 hearing, Bishop testified that he, Carder, Gray, and Howard made a decision to keep Hooks on the jury after the court brought her sleeping to their attention. The four of them agreed that they did not want the first alternate to replace Hooks, because the alternate was a middle-aged white

woman from "someplace else." Thus, it is again the case that the decision to keep Hooks on the jury was a matter of trial strategy. Further, Howard does not point to any specific instance of Hooks's sleeping through any particular point of the trial that he felt might have been significant, such that she might have missed critical evidence.[8] Accordingly, he has failed to demonstrate how he was prejudiced by Hooks's serving on his jury. Absent such a demonstration of prejudice, Rule 37 relief is not warranted.

In this fifth subpoint, Howard complains of his attorneys' performance during the State's closing arguments, asserting that, had his counsel properly responded or objected to three specific comments made by the State during closing arguments, there is a reasonable probability that the outcome of the trial would have been different. The first comment came when, during the State's closing argument, the prosecutor made the following statement:

> They want you to believe someone was out there meeting with Brian; that Tim Howard wasn't out there. Can I stand up here and tell you that there was no one out there besides Tim Howard and Brian Day? No, I can't. Can I tell you that no one was helping Tim Howard commit this offense, that no one was out there and helped him do any of this? No, I can't. But what's incredibly important, the bottom line, what's incredibly important in this case is that you don't have to believe Tim Howard was by himself. You don't have to believe Tim Howard committed this offense by himself to convict him. Because if, and I say a very big if, there were some people, somebody with Tim Howard in that field, that person, those persons, if there is somebody, are just as guilty as Tim Howard. And if there is somebody, if there was someone and they were arrested and they were charged, they would face the same punishment as Tim Howard. Just like him, they would have their day in front of someone like you. Before I even get into the evidence here, please understand that you do not have to believe he committed this by himself.

Mac Carder objected to the foregoing statement, arguing to the trial court that this was an improper argument because there was no accomplice instruction in the case. The State responded

---

[8] This court has noted that a sleeping juror is not *per se* prejudicial. *See Henderson v. State*, 349 Ark. 701, 80 S.W.3d 372 (2002) (following allegations of juror misconduct, the moving party bears the burden of proving that a reasonable possibility of prejudice resulted from any such juror misconduct); *Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996).

that it did not have to have an accomplice instruction to say that, if there were other people involved, they could be charged. The court overruled the objection, but told the State to "stay away from it" and not to go back into it. Carder subsequently asked the court to admonish the jury that there was no accomplice instruction in the case and that they should not consider that. In the alternative, Carder asked that the jury be admonished that they were to consider only the evidence, and not the argument of counsel. The court agreed to give that admonishment to the jury, but refused to admonish them about the accomplice instruction.

On appeal, Howard argues that his attorneys were ineffective for failing to raise this issue in the direct appeal. Had they done so, he contends, his conviction could have been reversed. However, Howard's attorneys properly raised an objection and sought an admonition from the trial court. Even though the issue was not raised on direct appeal, this court nonetheless considered the trial court's decision to overrule Howard's objection as part of its review of all adverse rulings pursuant to Ark. Sup. Ct. R. 4-3(h) and concluded that there was no error. *See Howard*, 348 Ark. at 496, 79 S.W.3d at 289. In *State v. Fudge*, 361 Ark. 412, 206 S.W.3d 850 (2005), this court held as follows:

> Ark. Sup. Ct. R. 4-3(h) requires an appellant in such a case to abstract all rulings adverse to him on all objections, motions, and requests made by either party. In Fudge's direct appeal to this court, we stated that "[i]n accordance with Ark. Sup. Ct. R. 4-3(h) (1998), the record has been reviewed for adverse rulings objected to by appellant James Fudge but not argued on appeal, and no reversible error was found." *Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000).
>
> We reviewed all errors, including the denial of [the motion that Fudge claimed should have been argued on appeal], and implicitly found no reversible error. Since there was no reversible error, counsel was not ineffective for failing to argue this point on appeal. Counsel cannot be found ineffective for failing to make an argument that has no merit. *See Monts v. State*, 312 Ark. 547, 851 S.W.2d 432 (1993). Because this issue was settled in Fudge's direct appeal, it is now the law of the case and cannot be reargued here. *See Camargo v. State*, 337 Ark. 105, 987 S.W.2d 680 (1999)[.]

*Fudge*, 361 Ark. at 428-29, 206 S.W.3d at 862-63. The same reasoning applies in the instant case; it was determined on direct appeal that

this ruling did not constitute reversible error, and Howard's counsel therefore cannot have been ineffective for failing to raise it.

Howard next argues that his counsel were ineffective for failing to ask for a mistrial or seek an admonition when the State asked the jury, during its closing argument, whether it "ever once hear[d] the word remorse" from Howard. Attorney Gray objected to that comment, arguing that "[t]he only words or remorse that could come out is out of Tim Howard's mouth, and it's an improper comment on [his] right not to testify." The trial court responded that it didn't "know that it is a comment. It might be reflected or could be reflected, so let's just avoid it." Howard raised this issue on direct appeal; however, this court rejected his claims, writing as follows:

> When an objection to a statement during closing argument is sustained, an appellant has been given all of the relief requested, and, consequently, there is no basis to raise the issue on appeal unless the appellant requests admonition to the jury or a mistrial. *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999). Furthermore, a comment is improper when it draws attention to the fact, or comments on, the defendant's failure to testify. *Jones* [*v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000)].

> . . . .

> Here, Howard did not seek further relief by moving for a mistrial or requesting an admonition to the jury. However, even if Howard had moved for a mistrial or an admonition to the jury, *the comment did not refer to Howard's failure to testify. Rather, Howard never expressed remorse to the witnesses that testified, not that he failed to express remorse to the jury.*

*Howard*, 348 Ark. at 489, 79 S.W.3d at 284 (emphasis added).

Rule 37 does not provide an opportunity for an appellant to reargue points that were settled on direct appeal. *Kemp v. State*, 348 Ark. 750, 74 S.W.3d 224 (2002); *Coulter v. State*, 343 Ark. 22, 31 S.W.3d 826 (2000). Therefore, there is no merit to Howard's arguments on this issue.

For his final claim regarding his attorneys' ineffective assistance during the State's closing arguments, Howard argues that his attorneys should have objected to several comments that the

prosecutor made to the jury that were allegedly unsupported by the evidence. There are three specific statements by the prosecutor to which, Howard argues, his attorneys should have objected. The first is as follows:

- The State's fourth aggravating factor is that in the commission of a capital murder the defendant knowingly created a great risk of death to a person other than the victim. When this defendant placed that little baby in the dark confines of that zipped-up canvas bag crammed with clothes, to muffle its bleating cries for help, slowly using up its short supply of air, he truly created a risk of death to little Trevor Day.

Howard argues that the State had introduced no physical evidence to support this argument, and that his attorneys therefore should have objected to the comment during the trial. He concedes that Trevor was found in a bag with clothes piled on top of him, and that investigating officers only found him because they heard him crying; nonetheless, he claims, because the baby was crying, "it is clear that there was no danger of loss of air." However, the evidence introduced at trial showed that Trevor, who was found with what appeared to be a lamp cord tied tightly around his neck, was "almost to the bottom [of a canvas bag with] clothing all piled up on top of the baby [and the] bag was zipped up." Thus, the comment about the baby "using up his short supply of air" was a fair inference from the evidence, *see Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999) (closing arguments must be confined to questions in issue, the evidence introduced during trial, and all reasonable inferences and deductions which can be drawn therefrom), and counsel did not render ineffective assistance by failing to object to the comment.

The second comment to which Howard contends his attorneys should have objected is the following:

- You heard one of the aggravating factors, cruel and depraved. . . . Brian . . . suffered . . . that night. Not only did he go through that unbelievable beating, he laid in that U-Haul alive and suffered.

Howard argues that the evidence did not show that Brian Day suffered in the back of the U-Haul, because the medical examiner's testimony made it clear that Brian would have lost

consciousness immediately upon sustaining any of his fatal injuries, including the hinge fracture to his skull, strangulation, or the bullet wound to the back of the head. However, the medical examiner, Dr. Charles Kokes, testified that Brian's body exhibited defensive injuries, indicating he was alive long enough to struggle. In addition, Dr. Kokes stated that there was an "extraordinarily large amount of blood in the U-Haul where the body was found," which indicated that he was placed in the U-Haul while he was still alive. Therefore, the suggestion that Brian suffered in the U-Haul was a fair inference from the evidence.

Finally, Howard challenges his attorneys' failure to object to the following comment during closing arguments:

- [P]robably the most horrible thing that happened that night was [Shannon Day] watching her seven month old child being strangled in front of her. I submit to you, ladies and gentlemen, the last thing that Shannon Day saw before she died was her seven month old baby hanging from an extension cord. That's how she left this world.

Howard raised an argument concerning this comment on direct appeal. Although the majority opinion acknowledged the State's argument that Howard failed to object to this comment, the court went on to conclude that the remark was not an error that required a *sua sponte* admonition from the trial court, and that the remark was a fair inference from the evidence. *Howard*, 348 Ark. at 495, 79 S.W.3d at 288 (finding it "plausible that Shannon Day watched the attempted murder of Trevor because of the antemortem wounds discovered on Shannon's body"). As noted above, Rule 37 does not provide an opportunity for an appellant to reargue points that were settled on direct appeal. *See Kemp, supra.*

This court has noted that experienced advocates might differ about when, or if, objections are called for since, as a matter of trial strategy, further objections from counsel may have succeeded in making the prosecutor's comments seem more significant to the jury. *See Sasser v. State,* 338 Ark. 375, 993 S.W.2d 901 (1999); *Neff v. State,* 287 Ark. 88, 696 S.W.2d 736 (1985). Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within

the wide range of permissible professional legal conduct. *Sasser, supra* (citing *Cohen v. United States*, 996 F. Supp. 110 (D. Mass. 1998)).

Howard's final argument regarding his allegations of ineffective assistance of counsel pertains to his attorneys' performance during the sentencing phase of his trial; in this point, he raises eight subpoints. In the first of these eight sub-arguments, Howard argues that Latrece Gray, who conducted the sentencing portion of his trial, was ineffective because she failed to discover Howard's history of physical and psychological abuse, which could have been associated with mental impairments that would have constituted mitigating factors. In addition, Howard asserts that Gray was ineffective because she failed to ask for funds for a psychologist and a neuropsychologist.

A trial counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase of a capital murder trial can constitute ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510 (2003)[9]; *Sanford v. State*, 342 Ark. 22, 25 S.W.3d 414 (2000). Counsel is obligated to conduct an investigation for the purpose of ascertaining mitigating evidence, and the failure to do so is error. *Echols, supra; Coulter, supra*. Such error, however, does not automatically require reversal unless it is shown that, but for counsel's errors, there is a reasonable probability that the sentence would have been different. *Echols, supra*. When reviewing a claim of ineffectiveness based upon failing to present adequate mitigating evidence, we view the totality of the evidence — both that adduced at trial and that adduced in the postconviction proceeding. *Id.*

In support of his Rule 37 petition, Howard submitted the affidavit of Scharlette Holdman, a mitigation specialist with the Center for Capital Assistance. Holdman averred that Howard's records, including portions of the trial transcript and his file from the State Hospital, revealed that he had a "compelling history of physical and psychological abuse that is commonly associated with significant mental impairments that range from brain damage to

---

[9] Citing *Wiggins, supra*, Howard argues on appeal that his attorneys were ineffective in their failure to investigate, discover, and utilize mitigating evidence such as his traumatic childhood. However, Howard did not raise his *Wiggins* argument to the trial court, and we will not consider an argument that is raised for the first time on appeal. *See Fisher v. State, supra.*

major psychiatric illness such as mood disorders." Holdman further opined that trial counsel should have discovered and presented to the jury the fact that Howard had suffered physical and emotional abuse in his childhood, and that Howard suffered from depression and drug and alcohol abuse. In addition, Holdman stated her belief that counsel should have investigated and prepared Howard's social and medical background, which would have demonstrated the extent and severity of Howard's mental impairments.

On appeal, Howard argues that Holdman's affidavit "pointed toward investigations to determine *whether* [he] had significant brain injury." However, as the State points out, there is no evidence that, even assuming that these investigations were ever conducted, Howard actually suffered from "brain injury." Howard has failed to provide evidence proving that further investigation would have produced proof that he suffered from any sort of mental disorder that would have functioned as mitigating evidence. Conclusory allegations such as this fall far short of meeting the *Strickland* standard, and are insufficient to warrant Rule 37 relief. *See Dansby v. State, supra.*

Further, at the Rule 37 hearing, Gray testified that Howard's trial was her first death-penalty trial. She further agreed that the defense team did not request money for a mitigation expert, and she agreed with Holdman's assessment of her performance. However, Gray also estimated that she had spent "anywhere from ten to fifteen hours a week on this case" for two years, which the trial court calculated to have amounted to between 1000 and 1500 hours of work. She stated that she was ready when they went to trial, although she could have used more time. Regarding Howard's mental status, Gray said that she spent about two or three hours a week with him for two years, and felt that she "knew him as well as [she] could." Based on Howard's mental evaluations and her personal observations of him, she noticed no signs of any type of psychosis. During the sentencing phase of the trial, Gray called twenty-one witnesses to testify on Howard's behalf. On these facts, the circuit court correctly determined that Gray did not fail to investigate and develop mitigation evidence.

Howard next contends that Gray was ineffective because she did not submit, on the jury's Form 2, the statutory mitigating circumstances set out in Ark. Code Ann. § 5-4-605 (Repl. 2006). In support of his argument, he cites *Sheridan v. State*, 313 Ark 23,

852 S.W.2d 772 (1993), which, he contends, requires that the statutory mitigating circumstances should always be submitted to the jury. *Sheridan* did not, however, hold that the failure to submit the statutory mitigating factors to the jury constitutes ineffective assistance of counsel. Rather, *Sheridan* held, consistent with *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the defense must be allowed during the sentencing phase to introduce any relevant mitigating evidence the defense proffers concerning the character or history of the offender or the circumstances of the offense. *Sheridan*, 313 Ark. at 39, 852 S.W.2d at 779. Further, not only must relevant mitigating evidence be admitted, it must actually be considered, which in appropriate cases means specifically instructing the jury to do so. *Id.*

Here, Gray testified at the Rule 37 hearing that she, the other attorneys, and Howard made a conscious choice not to submit the statutory mitigating factors, such as "the capital murder was committed while the defendant was under extreme mental or emotional disturbance" and "the capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse," because they were inconsistent with their defense of innocence. In addition, she stated that they chose not to utilize the mitigating circumstance that "the defendant has no significant history of prior criminal activity," because the evidence in the case showed that Howard did have a past of criminal activity, including drug dealing. These strategic decisions, the circuit court found, were "reasonable decision[s] based upon trial strategy." Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel. *See Simpson v. State*, 355 Ark. 294, 127 S.W.3d 486 (2003).

Next, Howard argues that Gray was ineffective for not submitting an instruction that would have informed the jury that a sentence of life imprisonment would really have meant that Howard would have spent the rest of his life in prison, without the possibility of parole. However, even assuming that Gray should have requested this instruction, Howard cannot demonstrate that he was prejudiced by this failure, because Gray specifically told the jury, during her closing arguments, that "If you put Tim Howard in prison, he won't be in heaven [as Brian and Shannon Day are].

Life without parole means just that. You die in prison." Accordingly, the jury was informed that "life means life," and the failure to request an instruction stating the same thing could not have resulted in prejudice to Howard.

Howard's fourth contention under this heading is his argument that the fact that the State twice extended an offer of a life sentence should have been submitted as a mitigating circumstance, because "such offers are mitigating circumstances under *Lockett v. Ohio*, 438 U.S. 586 (1978)." However, *Lockett* did not hold that plea offers are admissible as mitigating circumstances; rather, it held that, to meet constitutional requirements, "a death penalty statute must not preclude consideration of relevant mitigating factors." *Lockett*, 438 U.S. at 608. The consideration of mitigating factors, according to the *Lockett* Court, means that a jury must be permitted to "consider[ ] the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 604.

 Under Arkansas law, "relevant mitigating evidence" includes "the character or history of the offender or the circumstances of the offense." *See Sheridan*, 313 Ark. at 38, 852 S.W.2d at 779. Further, Ark. R. Crim. P. 25.4(a) (2005) provides that "[n]o evidence of any discussion between the parties, or any statement made by the defendant, or of the fact that the parties engaged in plea discussions shall be admissible in any criminal . . . proceeding[.]" Accordingly, it was not ineffective assistance of counsel for Howard's attorneys to fail to submit the fact that the State offered him a life sentence as a mitigating circumstance.

 Howard next contends that Gray was ineffective in her presentation of the mitigating evidence, in that "there was nothing at all coherent or organized about the presentation of the evidence of the many mitigating circumstances presented here. They were disjointed and not grouped to show similarities, and it was not apparent what many of them said about Howard's life." However, Howard cites to no authority that requires a "cohesive" strategy for presenting mitigation evidence. This court has repeatedly held that it will not consider an argument on appeal that has no citation to authority or convincing legal argument. *See McGahey v. State*, 362 Ark. 513, 210 S.W.3d 49 (2005); *Smith v. State*, 354 Ark. 226, 118 S.W.3d 542 (2003); *Kelly v. State*, 350 Ark. 238, 85 S.W.3d 893 (2002).

In his sixth subpoint, Howard claims that his attorneys were ineffective in failing "to appeal the jury's refusal to find undenied mitigation." He argues that the jury marked all but seven of the forty-three mitigating circumstances presented in Part C of Form 2, checking the statement that, while there was evidence presented to support these circumstances, "the jury unanimously agreed it was insufficient to establish that the mitigating circumstance(s) probably existed." None of the mitigating circumstances was challenged by the State, Howard argues, so there was no basis in the evidence to find that they did not exist. He further contends that, because the jury made these inconsistent findings, counsel should have raised the issue on appeal and was ineffective for failing to do so.

In *Echols v. State*, 326 Ark. 917, 942, 936 S.W.2d 509, 520 (1996), this court held that "a jury may generally refuse to believe a defendant's mitigating evidence, but when there is no question about credibility and, when, in addition, objective proof makes a reasonable conclusion inescapable, the jury cannot arbitrarily disregard that proof and refuse to reach that conclusion." The State asserts that Howard's witnesses were not of "indisputable" credibility, nor did not present irrefutable, objective proof of his mitigating factors, so there was no appealable error in the jury's decision to disbelieve Howard's witnesses.

Regardless of the quality of Howard's witnesses, however, the jury's actions in completing Part C of Form 2 constituted harmless error, because the jury also found beyond a reasonable doubt that four aggravating circumstances existed and that those aggravating factors outweighed any mitigating circumstances beyond a reasonable doubt. *See Robbins v. State*, 356 Ark. 225, 233, 149 S.W.3d 871, 875-76 (2004). Accordingly, counsel could not have been ineffective for failing to challenge the manner in which the jury filled out the verdict form.

Howard's next argument contends that trial counsel should have objected during the State's presentation of victim-impact testimony from Darby Neaves. Neaves, as mentioned above, spoke of Brian and Shannon Day as "soul mates with two children and one on the way." Neaves also read a statement from the Days' daughter, Karley, who said that she did not like Howard any more, and she did not like what he had done to her mom and dad. Neaves also read statements from one of Brian Day's brothers. In this appeal, Howard argues that the State's second closing argument in the penalty phase was "devoted almost entirely to victim impact.

Inasmuch as this encouraged the jury to impose the death penalty based on sympathy for the survivors, this evidence and this argument was a denial of due process."

■ However, Howard cites no authority that would indicate why Neaves's testimony constituted improper victim-impact evidence or that his attorneys would have been successful had they raised this argument on appeal. In addition, his attorneys did object to Neaves's comment about a "third [child] on the way." Moreover, the trial court did not render a ruling on Howard's contention that the State's closing arguments violated Howard's due process rights.[10] In the absence of a ruling on a specific issue, we will not address the argument on appeal.

■ Finally, Howard urges that trial counsel should have objected to the use of the "cruel or depraved" aggravating circumstance jury instruction because the instruction did not define the phrase "cruel or depraved." This argument is without merit, because even if the instruction did not define "cruel or depraved," the verdict form that the jury completed did contain definitions of both terms.

■ Howard's final point on appeal is that the errors in his trial were so numerous and egregious that their cumulative effect denied him due process and a fair trial. However, this court has held that we do not recognize cumulative error in allegations of ineffective assistance of counsel. *See Huddleston v. State*, 339 Ark. 266, 272, 5 S.W.3d 46, 50 (1999); *Isom v. State*, 284 Ark. 426, 682 S.W.2d 755 (1985). Accordingly, we reject Howard's final claim.

Affirmed.

HANNAH, C.J., and Special Justice A. WATSON BELL, dissent.

CORBIN, J., not participating.

JIM HANNAH, Chief Justice, dissenting. I respectfully dissent. Timothy Howard's Rule 37 petition is denied and again we fail to correct a manifest denial of due process and fundamental fairness

---

[10] The court's finding on this issue stated simply as follows: "The court notes that trial counsel did object to the use of victim impact evidence. The court finds that the victim impact evidence was not used improperly and was submitted in accordance with Ark. Code Ann. § 5-4-602(4)."

in this case. On direct appeal, this court affirmed the conviction and sentence even though the jury's decision was based on speculation and conjecture. This court also affirmed where prosecutorial misconduct was apparent, excusing an argument to the jury that "Shannon Day saw her child hanging from an extension cord before she died" as a fair inference from evidence that implied no such thing. Facts arising from a horrendous and brutal murder were used by the State to overwhelm and obscure the State's failure to present sufficient evidence to prove that Howard was the killer.

The right to have one's conviction rest upon proof beyond a reasonable doubt is not only a requirement of constitutionally declared and protected due process, but it is a right arising from the common law, and is a right which has its origins in ancient times. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In this case, two people were murdered, and a small child was brutally attacked, in what was apparently either a drug deal gone bad or an attempt to collect on drug debts. While Howard was certainly a valid suspect, there is the very real possibility that the murderer walks free today.

While Rule 37 petitions most often concern issues of alleged ineffective assistance of counsel, "[a] petitioner may qualify for relief under Ark. R. Crim. P. 37.1, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack." *Pardue v. State*, 363 Ark. 567, 570, 215 S.W.3d 650, 654 (2005). "The principal purpose of Rule 37 is to avoid unjust incarceration." *Bohanan v. State*, 336 Ark. 367, 372, 985 S.W.2d 708, 710 (1999). If there is concern under a Rule 37 analysis for unjust incarceration, then our concern should be greater in this case where the death penalty has been imposed.

A number of issues in this case merit serious consideration. First, Danny Russell was the sheriff of Little River County at the time of the murders and trial. He investigated the report that blood was running out of a locked trailer and was the first officer on the scene at the trailer where Brian's body was found. He was also first on the scene at the Day home where Shannon's body was found and where Trevor was discovered still alive. He uncovered Shannon's body. When the state police investigator arrived, Russell ceased his investigation; however, he was called to testify at trial and did testify as an investigating officer. In spite of such intimate contact with the investigation of the crime, Russell served as bailiff at trial, escorting jurors, providing coffee, and seeing to their needs.

In *Turner v. Louisana*, 379 U.S. 466 (1965), two of the State's principal witnesses to the crime investigation also served as bailiffs. They provided for the jury's needs, had lunch with the jury on two occasions, and dealt with the jury during sequestration. Testimony of the deputies showed that they never discussed the case with the jurors, but that they knew a number of the jurors before trial and made the acquaintance of other jurors during the trial. The United States Supreme Court stated that, "[i]t would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key witnesses who were not deputy sheriffs. But the role that Simmons and Rispone played as deputies made the association even more prejudicial." *Turner*, 379 U.S. at 474. The majority finds that Howard waived the issue at trial. What is at issue is an error so fundamental as to render the judgment of conviction void and subject to collateral attack. This is but one of many fundamental errors in this case in which Howard was denied a fair trial, and it should not be ignored. At the very least, it was ineffective assistance of counsel requiring relief.

Howard also argues that his attorneys failed to adequately investigate in preparation for trial. As the record shows, there were many witnesses in this case. One might argue that where defense counsel interviewed as large number of witnesses as was done by defense counsel in this case, the decision of what witnesses to interview is one of strategy. However, while defense counsel interviewed many of the witnesses identified by the State, there was another set of critical witnesses that were not identified or interviewed.

First, there was evidence that in the days before the murders Brain had close contact with drug dealers and drug associates from as far away as Oklahoma. Further, there was evidence that immediately prior to their deaths, Shannon and Brian were deeply concerned about demands on debts that they could not pay. There was evidence that at the time of their deaths they were packing to leave. There was also other evidence that demands for payment on the debt had been made. Brian had a significant history of drug sales, and there was evidence of unidentified persons at his house in the days just before his murder. While facts of such events came out indirectly through a witness or two at trial, the outcome might have been very different if witnesses who had first-hand knowledge of such things had testified. These witnesses were never located or produced. Counsel was ineffective for failing to adequately investigate.

I also note a number of other failures in investigation, including:

1. The failure to test the Caucasian hair found in the boots located at the side of the road;

2. The failure to identify the fingerprints on the wooden frame found atop Shannon's body;

3. The failure to test scrapings from beneath Shannon's nails; and

4. The failure to test Tim's clothes.

Despite two bloody murders, and evidence that Howard was wearing the same clothes on the day following the murders as on the day of the murders, no testing was done on his clothing.

Also, counsel's failure to adequately address Juror Ida Hooks's inability to stay awake during proceedings is an issue that has merit. Accepting a juror who had an admitted sleeping disorder and then failing to do anything about it once she began to doze off in trial constitutes ineffective assistance of counsel.

There are additional issues that have merit. In closing argument to the penalty phase, the State argued that there was no sign of remorse from Howard. In *Estelle v. Smith*, 451 U.S. 454, 462-63 (1980), the United States Supreme Court stated:

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial as far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.

Here again there was ineffective assistance of counsel that resulted in an error that denied Howard fundamental justice.

Other comments during closing argument were prejudicial, and yet they were not challenged. There was an argument that Trevor was placed in the bag to "muffle his pleading cries for help," when the evidence shows no such thing, and there was the same error when the State argued that Howard left Brian to suffer and die in the truck. Medical testimony showed that Brian died very quickly. We should grant Howard's petition and grant a new trial.

Special Justice A. Watson Bell, joins this dissent.

A WATSON BELL, Special Justice, dissenting. I join in Chief Justice Hannah's dissent. I also write separately to express my concern that justice has not been served in this case. I recognize that cumulative error is not recognized by this court with respect to claims of ineffective assistance of counsel. *See Weatherford v. State*, 363 Ark. 579, 215 S.W.3d 642 (2005). However, the error that is apparent in this case reaches far beyond error committed by counsel. The words of this court in *Childress v. State*, 322 Ark. 127, 140-41, 907 S.W.2d 718, 726 (1997), are instructive:

> We have stated that we will "entertain an argument of cumulative error in rare and egregious cases." *Vick v. State*, 314 Ark. 618, 627, 863 S.W.2d 820 (1993). We have reversed only when the cumulative effect of the errors committed denied the defendant a fair trial. *See Dillon v. State*, 311 Ark. 529, 844 S.W.2d 944 (1993) (finding that net effect of "overly zealous" comments by prosecutor, unsupported by evidence, combined to taint jury's decision); *Alexander v. Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986) (reversing when there were twenty-eight objections by appellant to leading questions, appellee was repeatedly admonished by trial judge and objections sustained but appellee's conduct not stopped); *Harris v. State*, 264 Ark. 391, 572 S.W.2d 389 (1978) (reversing when cumulative errors, omissions, and deficiencies in warrant were sufficient to undermine court's confidence in it).

We have before us a case where a combination of errors by the court, by counsel, and by the State have deprived Howard of a fair trial. While it might be most efficient to deal with some of the errors raised in the Rule 37 petition on direct appeal, it is only now that the case may be analyzed fully in light of all the error and only now that the full extent of the injury caused by the accumulated error is clearly manifest. "A petitioner may qualify for relief under Ark. R. Crim. P. 37.1, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack." *Pardue v. State*, 363 Ark. 567, 570, 215 S.W.3d 650, 654 (2005)(*per curiam*). Certainly, this is such a case.

Further, the death penalty has been imposed. This court has stated that, "[t]here is no question but that the death penalty is a unique punishment that demands unique attention to procedural safeguards." *Robbins v. State*, 353 Ark. 556, 561, 114 S.W.3d 217, 220 (2003). Those procedural safeguards mandate a new trial.

Simple concepts of justice that date from the common law dictate that a new trial be granted. Therefore, I respectfully dissent.

HANNAH, C.J., joins this dissent.